STATE of Missouri,
Plaintiff-Respondent,

v.

Alfred P. TAYLOR, Defendant-Appellant.

No. 12733.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 27, 1982.

Motion for Rehearing or to Transfer to
Supreme Court Denied
Jan. 17, 1983.

Application to Transfer Denied
Feb. 23, 1983.

John D. Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Donald E. Sotta, Joplin, for defendant-appellant.

TITUS, Judge.

The information herein, filed February 1, 1982, in the Circuit Court of Jasper County at Joplin, charged that the 41-year-old defendant on or about December 22, 1981, "knowingly caused physical injury to Marion Don Barton by means of a dangerous instrument" in violation of § 565.060.[1] Following trial held March 25–26, 1982, on the charge of assault in the second degree (a class D felony), the jury returned a verdict finding defendant guilty and assessed punishment at five years' imprisonment. Defendant's motion for acquittal or for a new trial was overruled. The court sentenced defendant to serve five years' imprisonment but execution of the sentence was suspended and defendant was placed on probation for five years upon condition that he serve 60 days in the county jail. Defendant appealed.

Inter alia, the trial court instructed on assault in the second degree via MAI–CR2d 19.04.2, i.e., that "defendant knowingly caused physical injury to Marion Don Bar-

1. Statutory references are to RSMo 1978.

ton by means of a dangerous instrument" and on assault in the third degree (a class A misdemeanor per § 565.070) via MAI–CR2d 19.06.1, i.e., that "defendant attempted to cause physical injury to Marion Don Barton by striking or kicking him." The lone point relied on by defendant in this appeal is that the court erred in not instructing on assault in the third degree by charging that "defendant *recklessly* caused physical injury to Marion Don Barton by striking or kicking him." (Emphasis supplied).

Barton, a resident of Tulsa, Oklahoma, and 48 at trial time, had been crippled since age three as the result of being struck by an automobile. This damaged the left side of his brain and crippled the right side of his body. Barton's sister and two nieces, Stacey Taylor and Becky Slankard, lived in Joplin, Missouri. Defendant was married to Stacey Taylor and was aware of Barton's disability. The other niece, Becky Slankard, was married to Robert Slankard.

On December 21, 1981, Barton telephoned defendant seeking Barton's sister. As a result of this defendant and his wife drove to Tulsa and brought Barton to their Joplin home. Upon their late arrival they found defendant's daughter. Later other visitors came to the house. Barton had consumed beer on the 21st and he and defendant continued their consumption on the trip to Joplin. The drinking continued at defendant's home until the early morning hours of the 22nd when Barton expressed a desire to visit his other niece. Defendant refused saying he would take Barton "tomorrow." According to Barton defendant also said "Everybody agrees with what Alfred [the defendant] says" and "What I say or what I do, everybody agrees, right?"

Following defendant's refusal to take Barton to see his other niece, Barton went to bed. At this time Barton testified he had no facial cuts or body bruises. Barton's next recollection was when defendant dragged him from bed, put him on the floor and commenced "hitting me in the face" with his fists "several times in the face and then he got up and the last I remember is that he stomped me right here on the chest

real hard" with a cowboy type boot he was wearing.

Becky Slankard, Barton's other niece, testified that before noon on December 22 defendant came to her house "because my sister was real upset. He said he had beat my uncle up . . . and he wanted me to come over there." Becky left a note telling her husband, Robert, where she was going and on the way to defendant's house defendant "was bragging about it. He said he stomped him and kicked him and beat him up. He said he kicked the shit out of him."

When Becky and defendant arrived at the latter's house, Becky learned her uncle, Barton, was in the kitchen but was warned, "Don't go in there." According to Becky, defendant entered the kitchen and she heard defendant "Telling my uncle to get up off the floor or he was going to kick him again and just saying all kinds of obscenities to him." About that time Becky's husband, Robert, arrived. When Robert started to enter the kitchen he recounted that defendant said "I have got to tell you he looks pretty bad. . . . I beat him up." Upon entering the kitchen Robert observed that Barton "was bleeding . . . he had cuts over both eyes and [defendant] said 'Well, you can't blame me, he shit in my floor.'" In cleaning and dressing Barton in preparing to remove him from defendant's house, Robert observed that Barton's "whole back was covered with bruises . . . and his foot on the paralyzed side was all bruised up . . . he was pretty messed up. He had blood all over him and everything else."

The doctor in charge of the hospital emergency room where Barton was taken said his examination revealed that Barton had "contusions over the orbit of both sides with lacerations there . . . contusions on the arms . . . contusions or bruises on the back and particularly the low back and low thoracic spine region." The doctor also determined that Barton had suffered a concussion, i.e., "a blow to the head which rendered the patient unconscious." Ten stitches were required to close the cuts over Barton's eyes. The doctor testified that a complete concussion "commonly does" cause

a person to lose control of their bowels. He also said it was "unlikely" Barton's injuries were consistent with falling down stairs. On cross-examination the doctor said Barton's blood alcohol level was ".24 percent" but it was doubtful if such would cause him to "pass out." After the doctor's initial examination and treatment in the emergency room, Barton was admitted to the hospital and remained a patient there for "four days or so."

A registered nurse on duty at the hospital emergency room when Barton arrived testified that when she inquired of Barton how he had been injured he told her "That he couldn't remember how he had been injured. He must have been unconscious at the time." However, after reviewing the hospital records the nurse testified that on December 23, the day after being admitted to the hospital, Barton had told a social worker at the hospital that he had been assaulted by the defendant.

Defendant recounted that he and his wife, Stacey, arrived in Tulsa to pick up Barton about one a.m. December 22. At that time defendant said Barton was drunk, "he couldn't stand up ... couldn't talk to nobody." Nevertheless, defendant testified that on the trip from Tulsa to Joplin Barton consumed, save for eight cans, a whole case of beer. The trio, according to defendant, arrived in Joplin at 4:00 or 4:30 a.m. and were soon joined by a next door neighbor, Quanita Beck, and her father and cousin. After a period of time Barton said he was ready for bed and was helped to a second floor bedroom where he reposed for a half-hour to an hour before coming downstairs to join the others and, so defendant testified, to continue his consumption of beer, vodka and whiskey. Defendant told the jury that Barton made frequent trips to the upstairs bathroom and that during some of these sojourns he fell on the stairway. Barton also, defendant related, fell elsewhere in the house including a fall down the back porch steps. Defendant was adamant in declaring that Barton had been visibly unharmed by any fall except for one which occurred in the living room when Barton fell striking his head on the first step of the stairway. This caused Barton, defendant said, "one little cut [over his right eye] along his eyebrow .... It was more bruised than it was cut." Defendant's wife, Stacey, testified that when she and defendant picked up Barton in Tulsa, Barton had a bruise over his right eye. Whether inconsistent with this pronouncement or not, Stacey, in apparent corroboration of defendant's just quoted statement, testified that the only injury received by Barton from the numerous falls at her home was when he was downstairs, fell and hit his head on the bottom step of the stairway and made a place "on his right forehead."

Defendant's testimony, generally agreed to by spouse Stacey and Mrs. Beck, was that at no time did he ever hit Barton or kick him "or cause any injury to him at all." Likewise, defendant said Barton did not resemble in the least, while he was at his home, any of the state's photographic exhibits of Barton taken after his admission to the hospital. Also, defendant denied having made any admissions to Becky and Robert Slankard that he had assaulted Barton in any manner.

■ Albeit "reckless" conduct constituting assault in the third degree under § 565.070.1(1) may be a lesser included offense of "knowing" conduct consisting of assault in the second degree per § 565.060.-1(1), § 556.046.2 provides "The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." This means that an instruction on a lesser-included offense is required only when there is evidence of probative value which could form a basis of an acquittal of the greater offense and a conviction of the lesser-included offense. *State v. Hill,* 614 S.W.2d 744, 749–750[6] (Mo.App.1981) and the many cases there cited. Otherwise, it would be "almost impossible to imagine any case where the lesser degree or included instruction would not be required." *State v. Olson,* 636 S.W.2d 318, 321[5] (Mo.banc 1982).

In the instant case the state's evidence was that defendant knowingly assaulted Barton by repeatedly beating him with his fists and stamping him with a dangerous instrument, i.e., a cowboy boot. On the other hand, defendant's testimony and that of his witnesses was that absolutely no assault whatever, whether with a dangerous instrument or not, had been made by defendant upon Barton. Nothing in either the state's or the defendant's evidence tended to show, or even suggest, that the assault on Barton had been made without the use of a dangerous instrument. Either there was assault with a dangerous instrument, or there was no assault whatsoever. And therefore there was no evidence which would provide a basis for both an acquittal of the higher offense and a conviction of the lesser offense.

The trial courts often face the problem of deciding whether to instruct on all lesser-included offenses, even though there is nothing of significance in the evidence that would draw the matter to the court's attention. And the problem is especially acute where, as here, the defense fails to request that the lesser-assault instruction be submitted. A defendant may not complain about a court's failure to give a lesser-offense instruction unless the defendant requests it specifically [*State v. Olson,* supra, 636 S.W.2d at 322–323(9) ], especially when the facts in evidence are insufficient to arguably support such a submission. *State v. Brandon,* 606 S.W.2d 784, 787[3] (Mo.App. 1980); *State v. Leindecker,* 594 S.W.2d 362, 364[4] (Mo.App.1980); *State v. Laususe,* 588 S.W.2d 719, 720–721[1, 2] (Mo.App.1979).

Judgment affirmed.

FLANIGAN, P.J., and GREENE, C.J., concur.